# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**TRACI SAUER**
              **Plaintiff,**

      **v.**                               **Case No. 19-C-927**

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
              **Defendant.**

---

## DECISION AND ORDER

In August 2014, plaintiff Traci Sauer applied for social security disability benefits, claiming that she could no longer work due to back, shoulder, and knee problems. The Administrative Law Judge ("ALJ") assigned to the case concluded that while plaintiff suffered from severe impairments she remained capable of a range of sedentary work. Plaintiff now seeks judicial review of the ALJ's decision, arguing that the ALJ overstated her residual functional capacity ("RFC") by cherry-picking evidence and inappropriately interpreting more recently developed evidence; improperly assessed the credibility of her statements; erroneously discounted the opinions of a treating physician; and failed to account for her potential work absences due to medical appointments.

Plaintiff's RFC argument amounts to mere disagreement with the manner in which the ALJ summarized and weighed the evidence, and her argument based on potential absences likewise falls flat. However, I agree that the matter must be remanded for a more complete evaluation of plaintiff's statements and the doctor's opinions.

# I.  FACTS AND BACKGROUND

## A.    Medical Evidence

Plaintiff suffers from a number of medical problems, including diabetes, migraine headaches, sleep apnea, asthma, a history of kidney cancer, depression, and anxiety.  In this action, however, plaintiff focuses on the impact of her back, shoulder, and knee impairments on her ability to sustain full-time work.  I accordingly concentrate on the evidence pertaining to those impairments in this summary.

The record indicates that plaintiff experienced back problems dating back to 2008 or 2009.  In December 2013, she sought treatment for back and radiating leg pain, which doctors attributed to left S1 radiculopathy based on an MRI documenting a large disc herniation at L5-S1.  (Tr. at 548, 555, 556, 616.)  After conservative treatment including medications and chiropractic failed to alleviate her symptoms, doctors found surgery warranted (Tr. at 616), and in February 2014 plaintiff underwent a partial discectomy, which provided some initial relief (Tr. at 618, 698).  However, her pain soon returned (Tr. at 623) and, following another MRI (Tr. at 605-06), she underwent a repeat micro-discectomy surgery in September 2014 (Tr. at 485, 491, 501, 504, 686, 689, 727).  She continued to have left leg pain with evidence of recurrent disc herniation on MRI (Tr. at 677), and due to the recurrent nature of the problem and continued severe pain, on January 16, 2015, Dr. Elena Gutierrez performed fusion surgery at the L5-S1 level (Tr. at 650, 793-96, 800, 820).

Plaintiff initially did well, reporting during January and February 2015 follow ups that her radiating leg symptoms had resolved, and her lingering low back pain was relatively well-controlled.  (Tr. at 828, 833.)  She was advised to begin physical therapy ("PT"), with a 30

2

pound lifting restriction. (Tr. at 833.) During a March 18, 2015, visit with Dr. Brenda Blohm, her primary physician, plaintiff reported good success post fusion with relief of her left sciatica. (Tr. at 919.) She had started PT, with some increasing pain and discomfort. (Tr. at 921.)

At an April 15, 2015, neurosurgery follow up, plaintiff continued to report complete resolution of left lower extremity pain, but she continued to struggle with persistent back pain and discomfort. She reported that increased walking caused onset of back pain, but it was not sharp or severe. On exam, she was able to stand and ambulate independently with a tandem gait, lumbar range of motion was limited slightly, and strength 5/5. The provider noted that three months post surgery plaintiff was progressing as expected and encouraged continued PT. She was to use ibuprofen for pain (Tr. at 1447) and provided a refill of hydrocodone for breakthrough pain (Tr. at 1448).

On June 15, 2015, plaintiff was seen for left shoulder pain of two to three weeks' duration. She reported no specific injury, the pain just started. She also complained of chronic neck pain. She took Vicodin as needed, about once per week, and was doing PT for her back. On exam, she was non-tender over the cervical spine, with no significant tenderness of the left shoulder and strong grip strength bilaterally, but positive impingement signs. (Tr. at 935.) She was provided pain medications for her shoulder, declining therapy. (Tr. at 936.) A June 18, 2015, left shoulder x-ray was negative. (Tr. at 939.)

On July 19, 2015, plaintiff returned to orthopedics for her left shoulder. (Tr. at 940.) On exam, she displayed reduced range of motion but full 5/5 strength. (Tr. at 943.) The doctor assessed pain consistent with a strain, recommending PT and anti-inflammatories. (Tr. at 944.)

On July 24, 2015, plaintiff followed up with neurosurgery regarding her back, reporting

3

complete resolution of leg pain but continued struggles with low back/sacral pain. She was doing PT, noting improvement in leg strength but complaining that core strengthening worsened her symptoms. She was taking over-the-counter medications for pain control. (Tr. at 1453.) On exam, she was able to stand independently and ambulate about the room. She had significant limitation in lumbar range of motion secondary to pain, but bilateral lower extremity strength was 5/5. Given her continued struggle with what appeared to be bilateral sacroiliac joint pain, she was referred to a pain clinic. (Tr. at 1454.)

On August 31, 2015, plaintiff saw Dr. Blohm for a physical. (Tr. at 1027.) Dr. Blohm recommended increased activity, further noting: "I do not feel she can go back to any type of lifting type job." (Tr. at 1031.)

On September 29, 2015, plaintiff commenced treatment at the pain center. (Tr. at 1457.) On exam, she displayed limited active range of motion and tenderness of the lumbosacral paraspinals, but 5/5 strength of upper and lower extremities and a normal gait. (Tr. at 1459.) The pain center provided a series of injections, gapabentin, and Tizanidine for muscle pain. (Tr. at 1460-61, 1471, 1476, 1479, 1483.)

On October 7, 2015, plaintiff followed up with orthopedics regarding her left shoulder. Last seen in July, she has been given a referral for PT and a prescription for Naproxen. She had not gone to therapy and reported that Naproxen did not help. (Tr. at 1038.) On exam, she displayed limited range of motion and 4+/5 strength. (Tr. at 1040.) The doctor recommended an MRI to check for rotator cuff pathology (Tr. at 1041) and made another referral to PT. (Tr. at 1044-46.) The MRI revealed a partial thickness tear of the infraspinatus, and the doctor recommended non-operative management at that time, including injections and therapy. (Tr. at 1054.)

4

On January 21, 2016, plaintiff had her one year follow up with neurosurgery. She denied any leg pain but still reported pain extending across the low back into the posterior hips bilaterally. Injections from the pain clinic provided no relief, per her report. She had been trying to stay active and was back to work 10 hours per week, but that also aggravated her symptoms. X-rays showed stable positioning of the hardware. Dr. Gutierrez found it hard to identify the source of plaintiff's pain; she was to continue follow up with the pain clinic. (Tr. at 1488.)

Plaintiff returned to the pain clinic on January 28, 2016, with the note indicating: "Symptoms did somewhat improve after the surgery but does continue significant amount of pain in her lower lumbar region to the hips." (Tr. at 1492.) She reported no relief from injections and minimal relief from gabapentin. (Tr. at 1492.) On exam, she displayed limited active range of motion, tenderness to palpation, 5/5 strength, and normal gait. (Tr. at 1493-94.) They planned to continue palliative care and encouraged plaintiff to increase activity level to toleration. (Tr. at 1493-94.)

Plaintiff saw Dr. Blohm on January 29 and February 26, 2016, reporting continued pain in the back and shoulder. (Tr. at 1077, 1081.) Dr. Blohm noted: "She really has limited work ability with her restrictions." (Tr. at 1081.)

On February 29, 2016, plaintiff followed up with orthopedics regarding her shoulder, reporting relief for two months after the injection, but that the pain gradually returned. (Tr. at 1086.) They decided to proceed with surgery (Tr. at 1090), and on March 8, 2016, Dr. Douglas Arnold performed an arthroscopic rotator cuff repair (Tr. at 1104). Plaintiff started PT for her shoulder on March 15 (Tr. at 1108), and during March 21 and April 16 follow ups she reported improvement (Tr. at 1111, 1117). Her restrictions were updated to include no lifting over

5

shoulder height with the left arm and five pounds lifting on left. (Tr. at 1121.) Plaintiff saw Dr. Blohm on April 20, reporting that she hoped to get back to work in the next couple weeks with restrictions. (Tr. at 1123.)

On May 12, 2016, plaintiff saw a nurse practitioner regarding her back pain and other issues. She reported that she was managing her pain with Tylenol and Oxycodone prescribed for her shoulder. (Tr. at 1130.) She was referred to PT and advised to continue her exercise program. (Tr. at 1133.)

On June 1, 2016, plaintiff returned to orthopedics regarding her shoulder, reporting a setback when she slipped and fell. (Tr. at 1154.) Her therapy was put on hold, and a repeat MRI was ordered to check for re-injury (Tr. at 1163, 1165), which showed mild attenuation of the construct fibers, but the construct remained intact (Tr. at 1170). On June 27, she reported continued soreness, taking hydrocodone and Tramadol. (Tr. at 1189.) On exam, she displayed 5/5 strength (Tr. at 1191), and she was given a injection and instructed to resume PT to work on strengthening and range of motion (Tr. at 1192).

In June and July 2016, plaintiff was also referred for further PT for her back. (Tr. at 1179, 1200.) However, on July 21, 2016, she discontinued therapy after attending twice, canceling four times. (Tr. at 1221.) She reported no significant relief (Tr. at 1222) and was formally discharged on August 24, 2016 (Tr. at 1243).

On August 16, 2016, plaintiff saw Dr. Kenneth Oh, an occupational health/rehabilitation specialist, for evaluation of her low back pain. She reported no radicular symptoms or weakness in the lower extremities. (Tr. at 1230-31.) On exam, she displayed some decreased range of lumbar motion, but she was able to do toe push ups and walk on heels and displayed normal strength of the bilateral lower extremities. (Tr. at 1233.) Dr. Oh assessed chronic right

6

worse than left lumbosacral pain without radicular symptoms. (Tr. at 1234.) Dr. Oh ordered new radiology studies (Tr. at 1235), and an August 24, 2016 MRI revealed (1) diffuse degenerative changes, most pronounced and at least mild in severity at L5-S1; (2) post-operative changes consistent with her history at L5-S1; (3) multi-level disc extrusions/herniations, spinal stenosis, and neural foramin encroachment, as described;[1] and (4) abnormal signal at L5-S1, with surrounding scar tissue. (Tr. at 1237.) An August 24 x-ray revealed degenerative changes most pronounced and mild to moderate in severity at L5-S1. Lumbar vertebral body heights and alignments were well maintained. (Tr. at 1370.)

On August 29, 2016, plaintiff followed up with Dr. Arnold's office, noting that her shoulder was doing better, her pain and strength improving. (Tr. at 1245.) She displayed full strength on exam and was noted to be doing well. In six weeks, she could progress to overhead lifting. (Tr. at 1249.)

On September 6, 2016, plaintiff returned to Dr. Oh. (Tr. at 1252.) He reviewed the recent MRI, indicating that plaintiff's symptoms may be related to degenerative changes at the L4-5 level facet joints. (Tr. at 1253.)

Plaintiff saw Dr. Blohm on September 6, 2016, and they discussed her medications and disability. (Tr. at 1255, 1258.) She had three back surgeries but had not recovered from the pain in the L3-5 area radiating across the low back bilaterally. She was also status post left shoulder rotator cuff repair in March. She had discharged from PT to continue a home

---

[1]The report earlier noted minimal to mild degenerative changes at L2-L3, with a tiny central disc herniation; mild degenerative disc disease at L3-L4, with a small central disc herniation; and mild degenerative disc disease at L4-L5. (Tr. at 1236.)

program, and Dr. Arnold was pleased with her progress.[2] She stated that she still was not able to do a lot of reaching overhead and would not be able to push anything overhead. The pain had improved, however. Her main concern was back pain, which caused inability to work. She stated that sitting over half an hour increased her pain to a 6 out of 10, and standing over 15 minutes in one place increased the pain to 7 out of 10. For her back, she took a regimen of gabapentin and Tizanidine. She did not typically take Tylenol or any narcotics. (Tr. at 1258.) Dr. Blohm noted: "The patient appears unable to work at this time. I would recommend moving forward with the appeal process that she and her attorney are working on and will hopefully be able to obtain some disability status while she continues to becoming more healthy." (Tr. at 1259.)

Later that month, Dr. Blohm completed a medical source statement, indicating that plaintiff could occasionally lift less than 10 pounds, frequently lift less than 5 pounds, stand/walk at least 2 hours in an 8-hour work day, and sit less than 6 hours in an 8-hour workday. (Tr. at 852-53.) She also needed to periodically alternate between sitting and standing to relieve pain. Her ability to push/pull was limited in both the upper extremities (due to her left shoulder surgery, with a 10 pound max) and lower extremities (due to her lumbar surgeries, which limited endurance and strength in the lower extremities). (Tr. at 853.) She could never climb or crawl, and only occasionally balance, kneel, crouch, and stoop. With the right arm, she could occasionally reach overhead, frequently reach in other directions; with the left, she could occasionally reach overhead and in other directions. (Tr. at 854.) Finally, she

---

[2]On September 17, 2016, plaintiff discharged from PT for her shoulder. She was seen for 26 sessions, canceled 13, no showed for one. Last seen on August 30, she called on September 6 to cancel her remaining sessions, reporting her shoulder was doing better and wanting to save therapy visits to focus on low back pain. (Tr. at 1265.)

8

needed to avoid concentrated exposure to extreme heat and cold, wetness, and humidity, and even moderate exposure to fumes, dust, and gases.  (Tr. at 855.)[3]

On September 14, 2016, plaintiff started PT for her back through Dr. Oh, scheduled to be seen twice per week for two months.  (Tr. at 1269-70.)  However, she discharged on October 12, 2016, after having been seen twice, cancelling three sessions, no showing for two. She did not provide a reason for discontinuing therapy.  (Tr. at 1299.)

On November 8, 2016, plaintiff followed up with Dr. Oh.  (Tr. at 948.)  Believing her symptoms related to the L4-5 facet joints, he decided to provide facet joint injections.  (Tr. at 951, 953.)  On December 12, plaintiff told Dr. Blohm the injection had not helped.  (Tr. at 955.) On January 6, 2017, plaintiff told Dr. Blohm she was having more pain in her left shoulder (Tr. at 967) and was referred back to orthopedics (Tr at 970).

On January 19, 2017, plaintiff saw orthopedics for her left shoulder, last seen August 2016, doing fairly well.  (Tr. at 979.)  On exam, she had some tenderness upon palpation, reduced range of motion, and 4/5 strength.  She was offered an injection (Tr. at 984), which was completed on January 24 (Tr. at 985).  A January 19 x-ray indicated that the left shoulder appeared intact and unchanged.  (Tr. at 1344.)

---

[3]The record also contains a September 26, 2014, physical capacities evaluation from Dr. Blohm, listing a diagnosis of lumbar radiculopathy.  In that report, Dr. Blohm indicated that plaintiff's symptoms would constantly interfere with the attention and concentration required to perform simple work-related tasks.  In an eight-hour workday, plaintiff could sit for two hours, stand for two hours, and walk for two hours.  She needed flexibility with sitting, standing, and walking for only 20 minutes at a time and needed to be able to alternate at will.  (Tr. at 475.) She could lift no more than 10 pounds.  (Tr. at 476.)  She could occasionally squat and reach above shoulder level, and never bend, crawl, or climb.  She had to avoid all exposure to unprotected heights and moderate exposure to moving machinery and dusts, fumes, and gases.  She would need unscheduled breaks during the workday due to chronic back pain and the ability to sit/stand/walk at will.  (Tr. at 477.)

9

On January 22, 2017, plaintiff was seen in emergency/urgent care for right low back pain following a fall four days ago. She was taking Advil, which was not effective. (Tr. at 1339.) On exam, she displayed mild tenderness, range of motion was painless, and straight leg raising did not illicit pain. (Tr. at 1342.) Her gait was steady, at normal pace, without difficulty. She was given pain medications and advised to follow up with Dr. Oh. (Tr. at 1343.) On January 23, Dr. Oh recommended chiropractic treatment. (Tr. at 987-89.) She was also scheduled to see Advanced Pain Management the next day. (Tr. at 990.)

On January 24, 2017, plaintiff commenced treatment at Advanced Pain Management ("APM"), reporting moderate right side low back pain, which did not radiate, aggravated by stairs, sitting, driving, lifting, and standing. She further reported that the pain interfered with sleep, daily activities, and work. (Tr. at 909.) On exam, she displayed lumbar tenderness and moderately reduced range of motion, but normal sensation, strength, and deep tendon reflexes. She was started on Vicodin and referred back to her surgeon for possible removal of hardware. (Tr. at 910.)

On February 21, 2017, plaintiff received injections at APM (Tr. at 913), but on March 21 she reported no relief. (Tr. at 915.) On June 6, she reported low back pain radiating to the right buttock, aggravated by sitting, walking, and daily activities, but with no numbness, weakness, or incontinence. She admitted to improvement in activities of daily living with her current medication. (Tr. at 1600.) On exam, her overall appearance was normal, as was her gait. The provider noted that her pain seemed facetogenic, possibly related to the SI joint, yet she failed to respond to an injection at that joint. Due to the lack of relief, a spinal cord stimulator ("SCS") was indicated but insurance would not cover that. Therefore, they continued with medication management. The provider diagnosed post-laminectomy syndrome, with a

10

plan of continuing a home exercise program, Vicodin, and ibuprofen. (Tr. at 1602.)

On August 2, 2017, plaintiff was seen for right knee pain. (Tr. at 1659.) On exam, she displayed normal gait, 5/5 strength, and full range of motion (Tr. at 1662-63.) She was advised to use rest, ice, compression, elevation, and ibuprofen. (Tr. at 1663.) On August 24, she reported that the knee pain seemed to be improving but was now increased again. (Tr. at 1671.) On exam, she had full range of motion of both knees, with no lateral or patella tenderness. (Tr. at 1677.) An x-ray was ordered, and she was referred to PT. (Tr. at 1678.) The x-ray revealed an apparent lateral subluxation of the patella. (Tr. at 1669.)

On August 29, 2017, plaintiff returned to APM, with low back pain radiating to the right buttock. As at previous visits, she reported the pain was aggravated by sitting, walking, and daily activities, and got better with ice and medication. She reported no numbness, weakness, or incontinence. With the current medication, she admitted to improvement in activities of daily living. She also reported right knee pain, about to start PT. (Tr. at 1596.) The provider again continued home exercises, Vicodin when necessary, and ibuprofen. (Tr. at 1598.)

On September 12, 2017, plaintiff saw Darcy Steinhorst, PA, at the family practice clinic for follow up. She noted that her chronic pain was followed by APM, and she took one tablet of hydrocodone every couple days. (Tr. at 1686.) Her gait was steady and her movement in the exam room completed without noted guarding or difficulty. (Tr. at 1691.)

On September 25, 2017, plaintiff saw Dr. Arnold for her right knee. (Tr. at 1697.) On exam, she displayed normal gait, full range of motion, and 5/5 strength. (Tr. at 1699.) X-rays showed no acute fracture or dislocation. Dr. Arnold indicated the physical exam was reassuring, and her pain should improve with PT. He also prescribed Naproxen. (Tr. at 1700, 1704.) In October 2017, plaintiff had PT for the right knee on referral from Dr. Arnold. (Tr. at

11

1618-21.)

On October 9, 2017, plaintiff saw PA Steinhorst for completion of a W2 form. Steinhorst noted: "At this point it has not felt feasible to find employment." (Tr. at 1711.) Plaintiff continued to take hydrocodone daily, as well as Naproxen, and received PT for knee pain. She also experienced chronic left shoulder pain; overhead duties were sometimes limiting as well as other repetitive activities with the left shoulder. (Tr. at 1711.) On exam, she appeared in no acute distress and moved about the exam room with no difficulty. Her gait was slowed, but she was able to get up on the exam table without noted difficulty on her own. Exam of the back revealed some reduced range of motion. (Tr. at 1716.)

On November 21, 2017, plaintiff returned to APM with a chief complaint of back pain. (Tr. at 1592.) The provider again continued medication management with Vicodin and ibuprofen. (Tr. at 1594-95.)

On November 22, 2017, plaintiff saw orthopedics follow up of her right knee. Last seen on September 25, 2017, she was referred to PT, went twice, then began doing her own exercises at the gym. She reported continued knee discomfort, including pain with climbing stairs and getting up from sitting. She was taking Naproxen twice daily. (Tr. at 1776.) On exam, she displayed normal gait, some tenderness, full range of motion, and 5/5 strength. (Tr. at 1778.) It was recommended she continue PT to work on quad strengthening, but she opted for home exercises. (Tr. at 1779.)

On January 10, 2018, plaintiff told Dr. Arnold her knee symptoms had not improved. (Tr. at 1811.) On exam, she displayed antalgic gait but 5/5 strength. (Tr. at 1813.) An MRI was ordered (Tr. at 1814), which showed full thickness focal chondral defect of the weight-bearing aspect of the lateral femoral condyle, and Dr. Arnold decided to proceed with surgery (Tr. at

12

1831, 1839, 1842.)

On February 13, 2018, plaintiff followed up at APM for back pain. (Tr. at 1587.) The provider again noted chronic low back pain radiating to the right buttock, which failed to respond to injections and could be hardware related v. arthritic. They continued medication management (Tr. at 1589), with diagnoses of post-laminectomy syndrome, not elsewhere classified; spinal stenosis, lumbosacral region; and BMI of 40.0-44.9.[4] (Tr. at 1590.)

On February 23, 2018, Dr. Arnold performed a right knee arthroscopic chondroplasty. (Tr. at 1883.) Plaintiff then participated in PT for the right knee, demonstrating functional improvement. (Tr. at 1604-1617.) On March 5, she reported tolerating therapy well. (Tr. at 1890.) Dr. Arnold noted she was doing well, progressing with expectations. He discontinued her knee brace and continued PT. (Tr. at 1893.)

On March 22, 2018, PA Steinhorst filled out a medical capacity for work program participation form. (Tr. at 1907-09.) She indicated that plaintiff could read and interact in a group setting 5-6 hours/day and use a computer, write, and sit 3-4 hours/day. (Tr. at 1907.) Because of her medications, she should avoid heavy machinery and driving. She was limited to sedentary work. (Tr. at 1908.)

A March 28, 2018, PT note indicated overall good mobility of the knee. Her range of motion was better, with 5/5 strength, and she walked with a normal gait pattern. She felt she was no longer in need of PT. (Tr. at 1905.) On April 2, plaintiff followed up with Dr. Arnold, reporting some pain and stiffness, trouble with stairs, and some swelling. (Tr. at 1911.) On exam, she had normal gait, trace effusion, no tenderness to palpation, and 5/5 strength. (Tr.

---

[4]A BMI ("body mass index") in excess of 40 reflects severe obesity. https://www.cdc.gov/obesity/adult/defining.html.

13

at 1913.)  Dr. Arnold indicated the next step was the "MACI procedure"[5] for which insurance approval was pending.  She was to perform exercises at home (Tr. at 1914) and continue to advance activities as tolerated  (Tr. at 1917).

On April 23, 2018, plaintiff saw PA Steinhorst with acute low back pain for two to three days.  (Tr. at 1925.)  On exam, she appeared uncomfortable with slow/guarded movements, tender lumbar paraspinals, and flexion and extension limited by pain.  Her gait was steady, but slowed. (Tr. at 1930.)  Steinhorst increased cyclobenzaprine (Tr. at 1931) and ordered PT (Tr. at 1932).

On May 1, 2018, plaintiff saw PA Steinhorst with worsening right knee pain.  She was awaiting approval for the MACI procedure.  Her back was still bothering her, but not as acutely as the last visit.  She took hydrocodone on average one to two times per day for her chronic pain.  She did not ask for more of this or other pain medication.  (Tr. at 1933.)  On exam, she displayed tenderness, guarded with movement.  Her gait was steady, slightly favoring the right knee, but she ambulated without assistance.  (Tr. at 1938.)

On June 14, 2018, plaintiff saw Dr. Arnold, indicating her knee continued to be painful with stairs, prolonged ambulation, and squatting.  (Tr. at 1951.)  She was scheduled for further surgery on June 26, 2018.  (Tr. at 1941.)

**B.    Procedural History**

**1.    Plaintiff's Application and Agency Decisions**

Plaintiff applied for benefits in August 2014, alleging that she became disabled as of July

---

[5]MACI, or "membrane-induced autologous chondrocyte implantation," uses a person's own cartilage to grow more cartilage and repair a damaged knee. https://www.healthline.com/health-news/new-technique-can-help-people-under-55-who-are-having-knee-surgery.

14

30, 2014. (Tr. at 284, 288, 371.) In a function report, she indicated that she could not lift or bend much, and always had butt and leg pain. (Tr. at 384.) She reported that her mother helped care for her son and clean the house, but she could tend to her personal care activities (aside from trouble shaving her legs) and sometimes prepared simple meals. (Tr. at 385-86, 425.) She further reported that she could not bend or crawl, could walk only short distances, and could lift only 10 pounds. (Tr. at 389.) In a physical activities addendum, plaintiff reported that she could sit for 30 minutes, stand for 20 minutes, and walk 20 minutes at a time, and sit two hours, stand two hours, and walk two hours in a day. She wrote that her doctor had limited lifting to 10 pounds. (Tr. at 392.)

The agency denied the application initially on November 13, 2014 (Tr. at 58, 108), based on the review of Mina Khorshidi, M.D., who concluded that plaintiff could perform the full range of sedentary work (Tr. at 66-67). Plaintiff requested reconsideration (Tr. at 119), but the agency maintained the denial on April 14, 2015 (Tr. at 80, 136), based on the review of George Walcott, M.D., who agreed that plaintiff could perform sedentary work (Tr. at 89-90).

### 2. Hearing

Plaintiff then requested a hearing (Tr. at 155), and on July 17, 2018, she appeared with counsel before an ALJ. The ALJ also called a vocational expert ("VE") to provide testimony on jobs plaintiff might be able to do. (Tr. at 30.)

#### a. Plaintiff

Plaintiff testified that she was 41 years old, with a high school level education, and past work as a CNA, production worker, and driver. (Tr. at 37-43.) Asked what prevented her from working now, plaintiff testified she that could not stand or sit for more than 10 minutes or walk

15

more than two blocks,[6] and that she had to lay down a lot because of her back. (Tr. at 43-44.) She testified that she could lift 10 pounds. (Tr. at 44.) She took a variety of pain medications, including hydrocodone and gabapentin. (Tr. at 45.)

Plaintiff testified that she lived with her seven year old son. She was able to care for him, but her parents helped with things like cleaning and taking her son to activities. She did some household chores, like dishes, with breaks because she could not stand for long. (Tr. at 46.) She could do the grocery shopping "as long as I use one of those carts. . . . But I'm always with family." (Tr. at 47.) She denied any hobbies. (Tr. at 47.)

Plaintiff testified that none of the treatments for her back had been effective, and the plan was to "just manage the pain as best you can." (Tr. at 48.) She also testified to issues with her left shoulder, which prevented her from reaching all the way up and caused pain reaching in front. (Tr. at 48.) She laid down every day, once per day, for a couple hours, to help relieve pain. (Tr. at 50.)

> **b.    VE**

The VE classified plaintiff past jobs as light and medium level work. (Tr. at 52.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to sedentary work with occasional climbing and postural movements, occasional reaching overhead and frequent reaching in other directions with the non-dominant arm, who needed to avoid hazards such as slippery surfaces, unprotected heights, and moving mechanical parts. (Tr. at 52-53.) The VE testified that such a person could not perform

---

[6]Plaintiff was at the time of the hearing still recovering from her second knee surgery. She testified that even before the surgery she could not "walk that far" because of her back. (Tr. at 43.)

plaintiff's past work but could do other jobs, such as visual inspector, inspector, and bench hand. (Tr. at 53-54.)

If the person could only work six hours per day, there would be no full-time competitive employment. (Tr. at 54.) If the person missed two days of work per month due to interference from pain symptoms, there would also be no jobs. (Tr. at 55.)

### 3. ALJ's Decision

On August 3, 2018, the ALJ issued an unfavorable decision. (Tr. at 10.) Following the familiar five-step process, see 20 C.F.R. §§ 1404.1520(a)(4), 416.920(a)(4), the ALJ determined at step one that plaintiff had not engaged in substantial gainful activity since July 30, 2014, the alleged onset date. (Tr. at 15.) At step two, she determined that plaintiff had the severe impairments of lumbar degenerative disc disease, degenerative joint disease of the knee, obesity, obstructive sleep apnea, asthma, headaches, and cervical degenerative disc disease. (Tr. at 16.)[7] At step three, the ALJ found that none of these impairments met or equaled a Listing. (Tr. at 16-17.)[8]

Prior to step four, the ALJ determined that plaintiff has the RFC to perform sedentary work except that she could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl; occasionally reach overhead and frequently reach in all other directions with her left (non-dominant) upper extremity, unlimited with her right (dominant) upper extremity; and must avoid concentrated exposure to slippery surfaces and hazards such as unprotected heights or moving mechanical parts. In making this finding, the ALJ considered plaintiff's alleged

---

[7]The ALJ found plaintiff's diabetes and history of kidney cancer non-severe (Tr. at 16), and plaintiff does not challenge those findings on appeal.

[8]Plaintiff does not challenge this finding either.

17

symptoms and the medical opinion evidence.  (Tr. at 17.)

In considering the symptoms, the ALJ noted the two-step process set forth in the regulations, under which she first had to determine whether plaintiff had shown a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. Second, once such an impairment had been shown, the ALJ had to evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limited plaintiff's functioning.  For this purpose, if the statements were not substantiated by objective medical evidence, the ALJ had to consider the other evidence in the record to determine if the symptoms limited plaintiff's ability to do work-related activities. (Tr. at 17, citing 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p.)

Plaintiff asserted that she could not work due to bulging and herniated discs. She stated that she had multiple surgeries on her back and right knee due to degenerative changes that caused pain and limitations.  She testified that pain in her back and legs prevented her from walking more than short distances and lifting more than 10 pounds even with pain medications, chiropractic treatment, and a history of injections.  She further alleged that she could not reach well with her left arm due to her shoulder problems.  Finally, she stated that she had trouble sleeping due to pain and obstructive sleep apnea.  (Tr. at 17.)

In terms of her activities, plaintiff testified that she lived with her seven-year-old son, whom she cared for with help from her family.  She also had help with cleaning and doing household chores, although she could grocery shop, attend to her personal care (with some problems shaving her legs), and cook simple meals occasionally.  (Tr. at 18.)

The ALJ then stated:

After careful consideration of the evidence, I find that [plaintiff's] medically

18

determinable impairments could reasonably be expected to produce the above alleged symptoms; however, [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect [plaintiff's] ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.

(Tr. at 18.)

Turning to the medical evidence, the ALJ noted that "the objective findings in this case fail to provide strong support for [plaintiff's] allegations of disabling symptoms and limitations and they do not support the existence of limitations greater than those reported in the above residual functional capacity." (Tr. at 18.) The ALJ acknowledged plaintiff's treatment for lumbar spine degenerative disc disease, including surgical procedures in February 2014, September 2014, and January 2015. In February 2015, plaintiff reported that she no longer had recurrent leg symptoms and that her back pain was well-controlled most of the time. Examination findings showed that she had normal ambulation, intact lumbar range of motion, and full lower extremity strength, and she was noted to have a 30 pound lifting restriction at that time. She subsequently began physical therapy, developing some left knee pain and persistent back discomfort. Despite the pain and discomfort, she retained full lower extremity strength and normal gait. She also complained of neck and left shoulder pain in June 2015, but imaging revealed only mild degenerative changes. (Tr. at 18.)

Beginning in October 2015, plaintiff received a series of trigger point injections to relieve lingering back pain. While she continued to complain of back pain in early 2016, she admitted she was no longer having lower extremity pain. She retained full muscle strength, although her lumbar range of motion caused tenderness, so she continued to receive pain management through March 2016. Due to continued pain, she also underwent a left rotator cuff repair in

19

March 2016, as well as a left shoulder joint injection in June 2016.  (Tr. at 18.)

The ALJ concluded that while plaintiff continued to experience left shoulder and lumbar pain, the longitudinal medical evidence did not show that this pain caused reductions in strength, sensation, gait, or range of motion that would prevent her from working at the reduced range of sedentary work detailed in the RFC.  The ALJ further found that plaintiff's obesity, while complicating her sleep apnea along with contributing to her pain, did not prevent her from lifting/carrying 10 pounds and standing/walking two hours in an eight hour day.  (Tr. at 19.)

The medical evidence showed that plaintiff continued to receive pain management treatment in 2017.  While she continued to report pain, she was not having weakness or numbness in her back or extremities.  Throughout 2017, she received conservative treatment including pain medication, chiropractic care, and physical therapy.  In August 2017, she reported some right knee pain, but she retained full range of motion and strength.  She admitted in September 2017 that she infrequently took narcotics for her pain.  Treatment records also showed that she continued pain management and physical therapy through 2017, ambulating well despite some pain.  She underwent right knee surgery in February 2018, attending physical therapy through March 2018, found to have full muscle strength and better range of motion of her knee.  (Tr. at 19.)

Overall, the ALJ agreed that plaintiff experienced pain and symptoms from her knee, back, and neck impairments, complicated by obesity, for which she received treatment including surgeries.  However, the ALJ found that this treatment consistently stabilized her functioning, and she retained full muscle strength, normal sensation, significant gait, and considerable range of motion.  The ALJ accordingly found that plaintiff could work at the sedentary level, which restricted the amount of weight she had to lift/carry and the total amount

of standing/walking required in a day, reducing the potential aggravation of her impairments. The ALJ also limited plaintiff to occasional reaching overhead and frequent reaching in other directions with the left arm due to her history of left shoulder symptoms. In addition, to avoid exacerbating her impairments, the ALJ limited plaintiff to occasional postural movements and climbing. The ALJ concluded that the objective medical evidence provided no basis for greater limitations, and that consideration of the factors in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) also led to the conclusion that plaintiff's subjective allegations were not consistent with the evidence of record. (Tr. at 19.)

As for the opinion evidence, the ALJ gave considerable weight to the opinions of the agency medical consultants, Drs. Khorshidi and Walcott, who opined that plaintiff could work at the full range of the sedentary exertional level. The ALJ found these opinions supported by plaintiff's examination findings and positive response to treatment. (Tr. at 20.)

The ALJ gave:

little weight to the two opinions provided by Brenda Blohm, M.D., whose statements assert that [plaintiff] cannot sit, stand, and/or walk for eight hours as needed to perform a workday. These opinions are inconsistent with [plaintiff's] treatment notes and her continued response to treatment that allows for her to perform daily activities including caring for her seven-year-old son[.]

(Tr. at 20.)

At step four, the ALJ determined that plaintiff could no longer do her past jobs, performed at the light and medium levels. (Tr. at 20.) At step five, however, she determined that plaintiff could perform other jobs, as identified by the VE. (Tr. at 21-22.) She accordingly found plaintiff not disabled. (Tr. at 22.)

On April 24, 2019, the Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the final decision of the Commissioner for purposes of judicial

21

review.  Prater v. Saul, 947 F.3d 479, 481 (7th Cir. 2020).  This action followed.

## II.  STANDARD OF REVIEW

The court will uphold an ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and builds an accurate and logical bridge from the evidence to the conclusions.  Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019).  A reviewing court will not, under this deferential standard, re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ.  Id.  Nor will the court require the ALJ to evaluate in writing every piece of testimony and evidence submitted; she need only sufficiently articulate her assessment of the evidence to enable the court to trace the path of her reasoning and be assured that she considered the important evidence.  Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993).

But this does not mean the court simply rubber stamps the ALJ's decision.  E.g., Scott v. Barnhart, 297 F.3d 589, 593 (7th Cir. 2002).  Of significance here, the Commissioner's regulations set forth various factors the ALJ must consider in evaluating medical opinions, see, e.g., Yurt v. Colvin, 758 F.3d 850, 860 (7th Cir. 2014), and claimant testimony, see, e.g., Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009), and remand may be required where the ALJ fails to perform the required analysis.

## III.  DISCUSSION

### A.    RFC and Assessment of the Medical Evidence

Residual functional capacity ("RFC") is an assessment of the claimant's ability to do

22

sustained work-related physical and mental activities in a work setting on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule. SSR 96-8p, 1996 SSR LEXIS 5, at *1. In determining what a claimant can still do despite her limitations, the ALJ must consider the entire record, including all relevant medical and non-medical evidence, Diaz v. Chater, 55 F.3d 300, 306 n.2 (7th Cir. 1995), and the assessment must incorporate all of the claimant's limitations supported by the record, Burmester, 920 F.3d at 511.

Plaintiff contends that the ALJ failed to include the limitations alleged in her function report and hearing testimony, which established that she could not sustain full-time employment. (Pl.'s Br. at 8.) However, an ALJ is not required to include in the RFC every limitation the claimant alleges, only those she "accepts as credible." Schmidt v. Astrue, 496 F.3d 833, 846 (7th Cir. 2007). As indicated above, the ALJ acknowledged that plaintiff experienced pain and symptoms from multiple knee, back, and neck impairments, finding that these impairments limited her to a reduced range of sedentary work, but that plaintiff's allegations of even greater limitation were not consistent with the medical and other evidence of record. (Tr. at 18-19.)

Plaintiff argues that in making her finding the ALJ cherry-picked from the record and "played doctor" in evaluating the medical evidence developed after the last agency physician review in April 2015. (Pl.'s Br. at 8.) Plaintiff acknowledges that the ALJ appropriately discussed her back surgeries in February 2014, September 2014, and January 2015, but argues that the ALJ improperly suggested that her condition improved after the fusion in January 2015. (Pl.'s Br. at 8-9.) She cites a number of records in which she told providers that while her radicular pain resolved she continued to experience localized pain in the low back,

23

for which she received injections and medication. (Pl.'s Br. at 9, 12-18.)

The ALJ summarized the post-surgical evidence, noting that plaintiff continued to complain of back pain, that she received a series of injections (Tr. at 18), and that she continued to obtain pain management treatment with medications and recommendations for chiropractic care and physical therapy (Tr. at 19). The ALJ did not, as plaintiff's alleges, exclude from the summary any of plaintiff's reported pain. (Pl.'s Br at 19.) The ALJ was not required to quote from all of the notes documenting those complaints. See Kolar v. Berryhill, 695 Fed. Appx. 161, 161 (7th Cir. 2017) ("ALJs need not comment on every line of every physician's treatment notes[.]"). The ALJ also discussed the objective findings, noting that despite her pain complaints plaintiff retained full muscle strength, normal sensation, significant gait, and considerable range of motion. (Tr. at 19.)

Plaintiff notes that an ALJ has the obligation to consider all relevant medical evidence and cannot select for discussion facts that support a finding of non-disability while ignoring evidence that points to a disability. (Pl.'s Br. at 20, citing Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009).) However, the ALJ need not mention every piece of evidence, so long she builds a logical bridge from the evidence to her conclusion. Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010). As indicated above, in the present case the ALJ accepted that plaintiff experienced pain but cited record evidence documenting plaintiff's stabilized functioning with treatment, further explaining that a limitation to sedentary work with limited reaching and postural movements would reduce the potential aggravation of her impairments. (Tr. at 19.)

Plaintiff contends that this finding was flawed and "simply seems to be based upon the ALJ's interpretation of the record." (Pl.'s Br. at 20.) ALJs are "entitled to make reasonable inferences from the evidence before" them. Stevenson v. Chater, 105 F.3d 1151, 1155 (7th Cir.

24

1997).  While an ALJ may not substitute her own judgment for a physician's without relying on other medical evidence of record, she is not only allowed to, but must, weigh the evidence, draw appropriate inferences from the evidence, and, where necessary, resolve conflicts in the evidence.  Thorps v. Astrue, 873 F. Supp. 2d 995, 1005 (N.D. Ill. 2012); see also Olsen v. Colvin, 551 Fed. Appx. 868, 874 (7th Cir. 2014) ("The cases in which we have concluded that an ALJ 'played doctor' are ones in which the ALJ ignored relevant evidence and substituted her own judgment."); Frye v. Saul, No. 18-cv-550-wmc, 2020 U.S. Dist. LEXIS 8954, at *21 (W.D. Wis. Jan. 17, 2020) ("As the Commissioner correctly notes, however, the ALJ did not interpret raw images or test data on her own, but rather accurately recited the findings as reported to or by plaintiff's treating physicians.").  Plaintiff cites no raw medical data the ALJ impermissibly interpreted here.[9]  Rather, the ALJ reviewed the treatment notes in which plaintiff's providers discussed her condition.  Evaluating such evidence is what the ALJ is supposed to do.  See Thorps, 873 F. Supp. 2d at 1006 ("That's not playing doctor, that's weighing the evidence.").  And mere disagreement with the manner in which the ALJ weighed the evidence provides no basis for remand.  See, e.g., Glenn v. Colvin, No. 16-C-573, 2016 U.S. Dist. LEXIS 164410, at *43 (E.D. Wis. Nov. 29, 2016).

Plaintiff argues that the ALJ improperly found that the three back surgeries were successful without any medical support (Pl.'s Br. at 20-21), but that is also inaccurate.  The ALJ cited the post-surgical notes from plaintiff's own providers documenting her partial improvement

─────────────────

[9]In reply, plaintiff cites Green v. Apfel, 204 F.3d 780, 782 (7th Cir. 2000), where the ALJ improperly interpreted the claimant's "pulmonary function and arterial gas studies."  The ALJ did nothing of the sort in this case.  Plaintiff acknowledges that ALJs may rely on medical records in which a doctor reviews medical data, so long as they do not attempt to interpret such data themselves.  (Pl.'s Rep. Br. at 12 n.1.)  That is essentially what the ALJ did here.

and functioning.[10]  (Tr. at 18-19.)  The ALJ also relied on the April 2015 opinion of the agency physician at the reconsideration level, which was given after the third back surgery in January 2015.  (Tr. at 20, 90.)  Moreover, while plaintiff in her briefs before this court focuses on the 2015-18 evidence, before the agency she alleged that she became disabled as of July 2014. It was thus reasonable for the ALJ to consider the agency physicians' assessments from November 2014 and April 2015, even if those doctors did not have access to the later evidence.

Plaintiff next faults the ALJ for examining the records from March 2015 forward without obtaining a new medical opinion.  (Pl.'s Br. at 21-22.)  The Seventh Circuit has held that an "ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." Moreno v. Berryhill, 882 F.3d 722, 728 (7th Cir. 2018), amended, 2018 U.S. App. LEXIS 9296 (7th Cir. Apr. 13, 2018) (citing Stage v. Colvin, 812 F.3d 1121, 1125 (7th Cir. 2016) (remanding where a later diagnostic report "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment"); Goins v. Colvin, 764 F.3d 677, 680 (7th Cir. 2014) (remanding after ALJ failed to submit new MRI to medical scrutiny)).

However, the Seventh Circuit has never held that an ALJ must obtain a new medical opinion whenever the claimant continues to receive treatment; if that were required, "a case might never end."  Keys v. Berryhill, 679 Fed. Appx. 477, 480-81 (7th Cir. 2017) (citing Scheck

_____

[10]In reply, plaintiff quotes at length from a number of treatment records post-dating the final back surgery.  (Pl.'s Rep. Br. at 2-6.)  As indicated, the ALJ was not required to comment on every line of the treatment notes.  Plaintiff argues, "This is hardly evidence that her condition resolved after February 2015 as the ALJ asserted."  (Pl.'s Rep. Br. at 6.)  But the ALJ never found that her condition resolved.  Rather, she concluded that the treatment "stabilized her functioning" such that she could perform a reduced range of sedentary work.  (Tr. at 19.)

26

v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004)).  Plaintiff fails to explain why the additional records documenting her subjective pain complaints reasonably would change the agency physicians' opinions regarding her ability to sustain full-time, sedentary work.  See Kennedy v. Saul, 418 F. Supp. 3d 314, 326 (W.D. Wis. 2019) (rejecting similar argument where the claimant pointed to no evidence showing that her physical condition worsened significantly after the state agency physicians rendered their opinions).

Moreover, the ALJ included additional limitations, beyond those recommended by the agency doctors, to account for plaintiff's shoulder impairment, which arose after the agency review, as well as her ongoing pain complaints.  See id. (noting that the "the ALJ imposed even more restrictive limitations than recommended by the state agency physicians").  This shows that the ALJ considered the entire record and did not blindly rely on the earlier agency assessments.[11]  See Schmidt, 496 F.3d at 845 ("[A]n ALJ must consider the entire record [and] is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians.").

As plaintiff correctly notes, the ALJ's discussion of the later medical records did omit mention of the August 2016 MRI.  (Pl.'s Br. at 15-16, 20, 22.)  It is debatable whether this MRI constitutes "new and potentially decisive medical evidence" requiring remand.  See Goins, 764 F.3d at 680.  The agency doctors reviewed plaintiff's previous MRIs documenting her lumbar spine condition (Tr. at 73, 98), and plaintiff develops no argument that the August 2016 scan documents a new condition or otherwise reveals a significant worsening of her previous

_____

[11]Plaintiff does not challenge the ALJ's reaching limitations (or any other specific restriction in the RFC).  Rather, her argument is based on the ALJ's conclusion that she could sustain full-time work.  (See Pl.'s Br. at 7, Rep. Br. at 1-2.)

27

condition.  See Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010) (finding no reversible error where the ALJ failed to discuss a later MRI which revealed some additional degenerative changes).  Nor is this a case like Akin v. Berryhill, 887 F.3d 314, 317-18 (7th Cir. 2018), which plaintiff also cites (Pl.'s Br. at 22-23), where the ALJ impermissibly played doctor by interpreting an MRI himself, without an expert opinion, finding it "consistent" with his assessment.  As plaintiff acknowledges, the ALJ here made no independent findings regarding the impact of the 2016 MRI.  (Pl.'s Br. at 23.)  Plaintiff contends that the ALJ must have provided her own consideration of this evidence in finding that plaintiff had a positive response to treatment.  (Pl.'s Br. at 23.)  But the ALJ did not say that, and my review is limited to the reasons she provided.  See Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002).  Ultimate, because the matter must be remanded for other reasons, I need not decide whether the 2016 MRI provides an independent basis for doing so.

**B.      Credibility of Plaintiff's Statements**

Plaintiff argues that the ALJ erred in evaluating the credibility of her statements.  (Pl.'s Br. at 23.)  Under the regulations, the ALJ must follow a two-step process in evaluating a claimant's statements regarding her symptoms and limitations.  See 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 16-3p.  First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  SSR 16-3p, 2016 SSR LEXIS 4, at *5.  Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work.  Id. at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a

28

variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, and the treatment she has received and other measures she uses for relief of the pain or other symptoms. <u>Id.</u> at *18-19. As the agency recently clarified, the focus of this inquiry is on the claimant's symptoms and how they affect her ability to work; it is not an assessment of the claimant's overall character or truthfulness. <u>Id.</u> at *27. The ALJ must provide specific reasons for her finding, consistent with the regulatory factors and supported by the evidence in the record. <u>Craft v. Astrue</u>, 539 F.3d 668, 678 (7th Cir. 2008). On review, the court affords considerable deference to the ALJ's finding, reversing only if it is "patently wrong." <u>Ray v. Berryhill</u>, 915 F.3d 486, 490 (7th Cir. 2019).

As set forth above, in the present case the ALJ acknowledged the two-step test set forth in the regulations (Tr. at 17), then proceeded to analyze whether plaintiff's statements about her symptoms could reasonably be accepted as consistent with the evidence (Tr. at 18). She made no assessment of plaintiff's character. Moreover, she did not entirely reject plaintiff's claims; rather, she limited plaintiff to a reduced range of sedentary work, with occasional reaching, climbing and postural movements, and avoidance of hazards to avoid exacerbation of her pain and other symptoms. (Tr. at 19.)

Plaintiff faults the ALJ for relying on the post-April 2015 treatment records. (Pl.'s Br. at 23-24.) While an ALJ may not discount a claimant's statements regarding her pain or other symptoms simply because they lack objective medical support, there is nothing wrong with considering the objective medical evidence as part of the analysis. <u>Simila v. Astrue</u>, 573 F.3d 503, 519 (7th Cir. 2009). And as discussed above, there is no rule forbidding an ALJ from weighing medical evidence that post-dates the agency physician opinions.

Plaintiff's challenge to the ALJ's reliance on her daily activities, including caring for her

29

variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, and the treatment she has received and other measures she uses for relief of the pain or other symptoms. <u>Id.</u> at *18-19. As the agency recently clarified, the focus of this inquiry is on the claimant's symptoms and how they affect her ability to work; it is not an assessment of the claimant's overall character or truthfulness. <u>Id.</u> at *27. The ALJ must provide specific reasons for her finding, consistent with the regulatory factors and supported by the evidence in the record. <u>Craft v. Astrue</u>, 539 F.3d 668, 678 (7th Cir. 2008). On review, the court affords considerable deference to the ALJ's finding, reversing only if it is "patently wrong." <u>Ray v. Berryhill</u>, 915 F.3d 486, 490 (7th Cir. 2019).

As set forth above, in the present case the ALJ acknowledged the two-step test set forth in the regulations (Tr. at 17), then proceeded to analyze whether plaintiff's statements about her symptoms could reasonably be accepted as consistent with the evidence (Tr. at 18). She made no assessment of plaintiff's character. Moreover, she did not entirely reject plaintiff's claims; rather, she limited plaintiff to a reduced range of sedentary work, with occasional reaching, climbing and postural movements, and avoidance of hazards to avoid exacerbation of her pain and other symptoms. (Tr. at 19.)

Plaintiff faults the ALJ for relying on the post-April 2015 treatment records. (Pl.'s Br. at 23-24.) While an ALJ may not discount a claimant's statements regarding her pain or other symptoms simply because they lack objective medical support, there is nothing wrong with considering the objective medical evidence as part of the analysis. <u>Simila v. Astrue</u>, 573 F.3d 503, 519 (7th Cir. 2009). And as discussed above, there is no rule forbidding an ALJ from weighing medical evidence that post-dates the agency physician opinions.

Plaintiff's challenge to the ALJ's reliance on her daily activities, including caring for her

29

son, gains more traction. (See Pl.'s Br. at 25.) While "it is proper for the Social Security Administration to consider a claimant's daily activities in judging disability, [the Seventh Circuit has] urged caution in equating these activities with the challenges of daily employment in a competitive environment, especially when the claimant is caring for a family member." Beardsley v. Colvin, 758 F.3d 834, 838 (7th Cir. 2014); see Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005) ("Gentle must take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts."); see also Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office."). The court of appeals has also stressed that the ALJ may not ignore the claimant's limitations in performing such activities. See, e.g., Meuser v. Colvin, 838 F.3d 905, 913 (7th Cir. 2016); Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013).

The ALJ cited several of plaintiff's activities, including caring care for her son, cleaning and doing household chores (with help from her parents), grocery shopping, personal care (with problems shaving her legs), and cooking simple meals. (Tr. at 18.) The Commissioner responds that the ALJ cited these activities, not to demonstrate that plaintiff could perform a particular job, but to point out evidence undercutting her allegations. (Def.'s Br. at 14.) I agree that this may be a permissible use of a claimant's activities. See Jeske, 955 F.3d at 592-93 ("Here, the ALJ did not reason that Jeske's activities of daily living are as demanding as those of full-time work. Rather, the ALJ considered Jeske's activities to determine whether her symptoms were as severe and limiting as she alleged."). The problem is that the ALJ never explained how any of these rather limited activities undercut any of plaintiff's contentions. See, e.g., Villano, 556 F.3d at 562 ("Although [the ALJ] briefly described Villano's testimony about

30

her daily activities, he did not, for example, explain whether Villano's daily activities were consistent or inconsistent with the pain and limitations she claimed."); Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001) ("While the ALJ did list Zurawski's daily activities, those activities are fairly restricted (e.g., washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain.").

Moreover, the key issue in this case is whether plaintiff is able to sustain full-time work. Plaintiff testified that she received significant help from her family with childcare and housework, that she took breaks while engaging in tasks like washing dishes (Tr. at 46), and that she had to lay down for a couple hours per day to relieve pain (Tr. at 50). The ALJ acknowledged some—but not all—of these qualifications. If accepted, it hard to see how plaintiff's activities "indicate an ability to work even a sedentary job full-time." Roddy, 705 F.3d at 639.

Finally, while the ALJ adequately summarized plaintiff's treatment history, she did not consider whether plaintiff's willingness to receive such treatment enhanced the credibility of her subjective claims. (See Pl.'s Br. at 19-20.) The Seventh Circuit has noted the improbability of a claimant undergoing significant pain-treatment procedures "merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits." Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir. 2004). Like the court in Carradine, I do not conclude that plaintiff's disability claim must be accepted. However, the matter must be remanded for a "a fuller and more exact engagement with the facts." Id. at 756.

**C.    Dr. Blohm's Opinions**

Plaintiff challenges the ALJ's evaluation of Dr. Blohm's opinions. (Pl.'s Br. at 26.) Under

31

the regulation applicable to plaintiff's claim, a treating physician's opinion on the nature and severity of a claimant's medical condition "is entitled to controlling weight if it is well supported by medical findings and consistent with other record evidence." Lambert v. Berryhill, 896 F.3d 768, 774 (7th Cir. 2018). If the ALJ finds that a treating source opinion does not meet the test for controlling weight, she must decide how much value it does have, considering a variety of factors, including the treatment relationship's length, nature, and extent; the opinion's supporting explanation and consistency with other evidence; and any specialty of the physician. Id. at 775; see 20 C.F.R. § 404.1527(c). Ultimately, the ALJ must give "good reasons" for discounting the opinions of a treating physician. Walker v. Berryhill, 900 F.3d 479, 485 (7th Cir. 2018).

As indicated above, the ALJ gave "little weight" to Dr. Blohm's opinions, finding them inconsistent with plaintiff's treatment notes and her continued response to treatment allowing her to perform daily activities, including caring for her son. (Tr. at 20.) Echoing her previous arguments, plaintiff first contends that while the ALJ asserted inconsistency she "never completely outlined the medical evidence after April 2015," she "relied on her own interpretation of the evidence," and she "ignored evidence favorable" to plaintiff. (Pl.'s Br. at 27.) For the reasons set forth above, I do not find this argument persuasive. See Diaz, 55 F.3d at 308.

I do, however, agree with plaintiff's second claim—that the ALJ failed to apply the proper legal standards. (Pl.'s Br. at 29.) The ALJ's evaluation of Dr. Blohm's opinions, which consists of just two sentences, does not specifically address the controlling weight issue, nor does it mention any of the regulatory factors other than "consistency."[12]

_____

[12]Plaintiff complains that the ALJ provided no specific findings showing inconsistencies. (Pl.'s Br. at 27.) While plaintiff correctly states that review is limited to the reasons provided

32

As the Commissioner notes (Def.'s Br. at 12), "consistency" is part of both the "controlling weight" and "other weight" inquiries, and failure to explicitly discuss all of the other regulatory factors does not necessarily require remand.  See Schreiber v. Colvin, 519 Fed. Appx. 951, 959 (7th Cir. 2013); Henke v. Astrue, 498 Fed. Appx. 636, 640 n.3 (7th Cir. 2012); see also Elder v. Astrue, 529 F.3d 408, 415-16 (7th Cir. 2008) (affirming where ALJ discussed only two of the relevant factors).  While the Seventh Circuit has not specifically held, in a published opinion, that the ALJ must always discuss each and every one of the regulatory factors in her written decision,[13] the court has repeatedly stressed the importance of those factors in evaluating treating source opinions.  See, e.g., Gerstner v. Berryhill, 879 F.3d 257, 263 (7th Cir. 2018) ("ALJs must decide the weight of a treating physician's non-controlling opinion by considering, to the extent applicable, the treatment relationship's length, nature, and extent; the opinion's consistency with other evidence; the explanatory support for the opinion; and any specialty of the treating physician."); Meuser v. Colvin, 838 F.3d 905, 912 (7th Cir. 2016) ("[T]he ALJ was required to explicitly consider the details of the treatment relationship and explain the weight he was giving the opinion."); Yurt, 758 F.3d at 860 ("[I]n addition to

_____

by the ALJ—and the court should not scour the record for supportive evidence—it also well-settled that the court reads the ALJ's decision as a whole to determine whether she considered the relevant evidence, made the required determinations, and gave supporting reasons for her decision.  E.g., Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015).  Earlier in her decision, the ALJ stated that treatment stabilized plaintiff's functioning, and she retained full muscle strength, normal sensation, significant gait, and considerable range of motion.  (Tr. at 19.)  Perhaps these were the inconsistencies to which the ALJ alluded in discounting Dr. Blohm's opinions, but it is unnecessary to draw that conclusion.  The ALJ should on remand provide a more complete assessment of these opinions, spelling out any inconsistencies with the record.

[13]But cf. Lehouillier v. Colvin, 633 Fed. Appx. 328, 334 n.1 (7th Cir. 2015) ("[T]his circuit already requires that ALJs address the regulation's checklist of factors in determining how much weight to give the opinion of a treating source.").

33

summarizing Yurt's visits and describing their treatment notes, the ALJ should explicitly consider the details of the treatment relationship and provide reasons for the weight given to their opinions.") (citing 20 C.F.R. § 404.1527(c)(2) (describing six factor weighing process ALJ must perform for "every" treating physician); <u>Campbell v. Astrue</u>, 627 F.3d 299, 308 (7th Cir. 2010) (reversing where "the decision does not explicitly address the checklist of factors as applied to the medical opinion evidence").

Here, the ALJ said nothing about plaintiff's extensive treatment history with Dr. Blohm. (<u>See</u> Pl.'s Rep. Br. at 13-14.) And while Dr. Blohm's status as a primary/family medicine doctor might not supply her with particular expertise regarding plaintiff's back impairment, she did have access to the records of the specialists (<u>E.g.</u>, Tr. at 1230, Dr. Oh's 8/16/16 letter to Dr. Blohm) and the August 2016 MRI (Tr. at 1236-37) at the time she prepared her September 2016 report.

Finally, the ALJ relied on plaintiff's activities, including caring for her son, without explaining how those activities undercut Dr. Blohm's opinions. <u>See</u> <u>Burgos v. Saul</u>, 788 Fed. Appx. 1027, 1031 (7th Cir. 2019) (reversing where the ALJ failed to explain why the claimant would be unable to perform certain activities if he had the limitations the doctor proposed). As in the credibility context, the Seventh Circuit has "repeatedly underscored the necessity of the ALJ articulating why a claimant's daily activities undermine a physician's opinion and to avoid inferring an ability to do full-time work from a claimant's occasional activities." <u>Id.</u> (citing <u>Vanprooyen v. Berryhill</u>, 864 F.3d 567, 571 (7th Cir. 2017); <u>Clifford v. Apfel</u>, 227 F.3d 863, 870 (7th Cir. 2000)).

For the foregoing reasons, the matter also must be remanded for reconsideration of Dr. Blohm's opinion under the treating source regulation.

34

**D.    Absences**

Plaintiff briefly argues that the ALJ failed to account for potential work absences due to medical appointments.  She notes 24 such appointments in 2016, which would exceed employer tolerance for absences.  (Pl.'s Br. at 29-30; see Tr. at 55: VE testimony that two absences per month would preclude work.)

Numerosity of medical appointments alone cannot establish disability.  See Hoppa v. Colvin, No. 12-cv-847-bbc, 2013 U.S. Dist. LEXIS 156147, at *13 (W.D. Wis. Oct. 30, 2013) ("If the 'sheer number of medical visits' were sufficient on its own, claimants could manufacture their own disabilities simply by going to the doctor as often as possible for any or no reason."). While in some cases a claimant's need for extensive treatment might preclude a regular, full-time work schedule, see, e.g., Cooper v. Colvin, 224 F. Supp. 3d 663, 671 (C.D. Ill. 2016), plaintiff develops no such an argument here.  She relies solely on the number of appointments. That is insufficient.  See Best v. Berryhill, 730 Fed. Appx. 380, 382 (7th Cir. 2018) ("Best cannot point to anything in the record to suggest that his appointments would require him to miss a full day of work or that he could not schedule his appointments outside of working hours."); Barnett v. Apfel, 231 F.3d 687, 691 (10th Cir. 2000) ("[P]laintiff's current extrapolation of how many days she must have missed from work based on her medical record is faulty . . . in that it assumes she was required to miss entire days of work for each appointment."); Stone v. Berryhill, No. 17-cv-3193, 2018 U.S. Dist. LEXIS 182284, at *60 (C.D. Ill. Oct. 18, 2018) ("Stone is speculating on what she would have done had she been working. If Stone had been working, she might have scheduled her medical appointments on her days off or combined

35

appointments. No one knows. No one knows because this argument is all speculation.").[14]

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded for further proceedings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 19th day of June, 2020.

s/ Lynn Adelman
LYNN ADELMAN
District Judge

---

[14]In reply, plaintiff contends that the Commissioner provided no response to this argument and thus waived the right to contest it. (Pl.'s Rep. Br. at 15.) That is incorrect. The Commissioner responded that the argument was not well-developed and, citing Best, 730 Fed. Appx. at 382, that plaintiff's scheduling of medical appointments did not compel the ALJ to include additional limitations in the RFC. (Def.'s Br. at 14-15.)

36